# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SMARTTRAN, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 07-381 |
| ) | |
| v. ) | Judge McVerry |
| ) | Magistrate Judge Bissoon |
| ALPINE CONFECTIONS, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Partial Summary Judgment on liability (Doc. 56) be denied, and Defendants' Motion for Summary Judgment (Doc. 73) be granted.

### II. REPORT

**BACKGROUND**

This diversity action arises from an agreement between Plaintiff SmartTran, Inc. ("Plaintiff") and Defendant Alpine Confections, Inc. ("Alpine"). *See generally* Compl. (Doc. 1). Plaintiff analyzes the small parcel transportation needs of its clients and makes recommendations for negotiating contracts with large shipping companies. *See generally* Defs.' Facts (Doc. 75) at ¶ 1.[1] In January 2004, Plaintiff entered a written Consulting Agreement ("the Agreement") with Alpine, a company that manufactured and sold candy under various trade names. *See* Pl.'s Facts (Doc. 58) at ¶ 3. At the time, Alpine owned a series of related corporations, including

---

[1] Unless otherwise noted, the parties' Statements of Fact are relied upon only to the extent they are not materially disputed.

Defendants Maxfield Candy Company ("Maxfield"), Kencraft, Inc. ("Kencraft"), and Harry London ("London"). *See* Defs.' Facts at ¶ 4.[2] These entities are relevant because the Agreement applied to Alpine's "related corporations, subsidiaries, associations, and related businesses which utilize[d] the recommendations submitted by [Plaintiff]." *See* Agreement (attached as Ex. A to Compl.) at ¶ 10.

In its "Recital," the Agreement stated:

1. [Alpine] utilizes small package transportation services as part of its business operations.

2. [Plaintiff] analyzes small package transportation services and makes recommendations related to cost effective shipping of small packages.

3. [Alpine] desires to have [Plaintiff] review its use of small package transportation services and to determine if [Alpine] can achieve cost savings.

*Id.* at "Recital."

To these ends, the Agreement provided in relevant part as follows:

- [Alpine, referred to in the Agreement as] Client[,] retains [Plaintiff] for the purposes of analyzing [its] utilization of small package transportation services and for making recommendations to Client.

- In the event that . . . Client, during the term of this . . . Agreement, obtains a rate discount increase, or a decrease in applicable rates, the fee set forth [herein] shall be payable to [Plaintiff].

- [Plaintiff] will analyze the information provided by Client and submit written recommendations to Client regarding small package transportation costs, services and utilization.

---

[2] Although "Fannie Farmer" also is identified as a Defendant, the parties now agree this was a brand name rather than a company. *Id.*

- Client will, within thirty . . . days of the receipt of [Plaintiff's] written recommendations, provide [Plaintiff] with pertinent information about [the] recommendations including Client's intended use [thereof] . . . .

- [Plaintiff's] fee for services will be . . . [f]ifty percent . . . of all savings realized payable for a period of thirty-six months from the date the savings first become effective. [Plaintiff] shall invoice Client [and be paid on a] monthly [basis] . . . . [Plaintiff] will not be paid a fee unless savings actually become effective.

- [Plaintiff] shall be entitled to the fee set forth in this Agreement if Client utilizes [its] recommendations at any time within two . . . years of the date [Plaintiff] submits it recommendations to Client.

- This Agreement will apply to all small package transportation savings effected by [Plaintiff] regardless of Client's locations.

*Id.* at ¶¶ 1-2, 5-7, 9-10.

Prior to the Agreement, Alpine and its related corporations operated under existing carrier agreement(s) with UPS. *See* Defs.' Facts at ¶ 5. Alpine utilized Plaintiff's recommendations and entered a new UPS carrier agreement effective June 20, 2005 ("the UPS/Alpine Agreement" or "the 2005 Agreement"), under which it and its related companies received lower shipping rates. *See id.* at ¶¶ 11-13. Plaintiff began invoicing, and Alpine began paying, amounts identified as 50% of the savings Alpine and its related companies enjoyed under the UPS/Alpine Agreement. *See id.* at ¶ 13.

This continued until April 2006, when Alpine underwent a major corporate reorganization, including the sale of certain business interests to 1-800-Flowers.com ("Flowers") for a sum in excess of $85 million. *See* Defs.' Facts at ¶ 14; Pl.'s Facts at ¶16. Under the restructuring: (a) Alpine changed its name to Fannie May Confections Brands, Inc. ("Fannie May/Alpine"); (b) Maxfield and Kencraft became subsidiaries of a newly-formed corporation,

3

KDM Holdings ("KDM"); and (c) Flowers purchased Fannie May/Alpine and two of its remaining subsidiaries, including London. *See* Defs.' Facts at ¶ 14.

After the restructuring, Fannie May/Alpine and London began operating under Flowers's preexisting, independently negotiated carrier agreement with UPS, which was more favorable than the UPS/Alpine Agreement because Flowers held a "large strategic [UPS] account." *See* Defs.' Facts at ¶¶ 15-16.[3] Defendants continued to pay Plaintiff's invoices through October 2006, when Fannie May/Alpine advised Plaintiff in writing that Defendant(s) no longer were relying on its recommendations for the purposes of shipping services. *See* Defs.' Facts at ¶¶ 19, 22.

The same day Fannie May/Alpine advised Plaintiff of its shipping arrangement through Flowers, UPS, "of its own accord," cancelled the UPS/Alpine Agreement as it related to Kencraft and Maxfield (now owned by KDM) because the shipping rates available to them were no longer favorable in the absence of Fannie May/Alpine's and London's shipments. *Id.* at ¶ 20; *see also id.* at ¶ 23.[4] UPS and KDM entered a new carrier agreement, based only on Kencraft and Maxfield's historical shipping characteristics and market rates, which was accepted by KDM as presented by UPS. Defs.' Facts at ¶ 26; *see id.* at ¶ 28 (citing testimony of principals to

---

[3] Plaintiff "denie[s]" that Fannie May/Alpine and London were "added" to Flowers's UPS account based on, among other things, the purported lack of written memorialization regarding the same. *See* Pl.'s Resp. to Defs.' Facts (Doc. 86) at ¶¶ 15-16. Plaintiff has failed to present affirmative evidence refuting Defendants' facts, however, and in any event these issues are immaterial to its arguments in opposition to summary judgment. *See generally* Pl.'s Opp'n Br. (Doc. 84). The same holds true for Plaintiff's remaining denials, at least to the extent Defendants' Statements of Fact are relied upon herein.

[4] Although Plaintiff again makes technicality-based denials of Defendants' Statements of Fact, none of the denials undermine the assertion that <u>UPS</u> terminated the 2005 Agreement as it related to Kencraft and Maxfield. *See generally* Pl.'s Resp. to Defs.' Facts at ¶ 20. Notably, Plaintiff does not seek to impose liability on UPS under any type of concerted-action theory. *See generally* Compl.

KDM/UPS contract stating that, despite Plaintiff's suggestions to contrary, relevant Defendants accepted UPS's proposals as presented).

Based on these events, Plaintiff brings claims against Fannie May/Alpine, London, Maxfield, Kencraft, and Flowers for breach of contract, including the implied duties of good faith and fair dealing, and unjust enrichment. *See* Compl. at Count I (breach of contract against all Defendants); Count II (unjust enrichment against Flowers).

## ANALYSIS

In the Court's view, the question of whether any Defendant can be liable for breach of contract is straightforward: did the Agreement contemplate Plaintiff's continued receipt of fees when an unanticipated business reorganization resulted in Alpine and its related entities enjoying lower shipping rates, wholly independent of Plaintiff's recommendations? The obvious answer is "no."

When interpreting a written agreement, the contract "must be construed as a whole and the parties' intentions . . . ascertained from the entire instrument." Harrity v. Medical Coll. of Pennsylvania Hosp., 653 A.2d 5, 10 (Pa. Super. 1994) (citations omitted). "In order to ascertain the intention of the parties, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." *Id.* (citation and internal quotations omitted). In the end, "[t]he court will adopt [the] interpretation that is most reasonable and probable bearing in mind the objects . . . the parties intended to accomplish through the agreement." *Id.*[5]

---

[5] Although the parties have identified a potential choice-of-law issue, their briefing does not definitively resolve it. *Compare* Pl.'s Br. in Supp. of Mot. for Partial Summ. J. (Doc. 57) at 4 n.2 (stating "it is unclear whether Pennsylvania or Utah law would apply," but concluding there is no meaningful distinction between two) *with* Defs.' Br. in Opp'n to Pl.'s Mot. for Partial Summ. J.

5

In light of the aforementioned principals, the Court is left with little doubt that the Agreement contemplated Plaintiff's receipt of fees <u>only to the extent cost savings resulted from Defendants' use of its recommendations</u>. The provisions supporting this conclusion are too plain and numerous to ignore:

- Plaintiff "analyzes small package transportation services and <u>makes recommendations related to cost effective shipping</u>," and Alpine retained its services to "determine if [it could] achieve cost savings" through the same;

- Alpine "retain[ed Plaintiff] for the purposes of analyzing [its] utilization of small package transportation services and <u>for making recommendations</u>";

- Plaintiff would "analyze the information provided by [Alpine] and submit [such] written recommendations";

- Upon receipt of the recommendations, Alpine would "provide [Plaintiff] with pertinent information about [the] recommendations including Client's intended use [thereof]";

- The Agreement extended to Alpine's "related businesses <u>[that] utilize[d Plaintiff's] recommendations</u>";

- Should the recommendations cause Alpine to "obtain[] a rate discount increase, or a decrease in applicable rates," fees would be owing to Plaintiff;

- Plaintiff's fees were 50% "of all savings realized";

- If Alpine "utilize[d]" the recommendations "at any time within two . . . years," Plaintiff would be entitled to fees, but only if "savings actually bec[a]me effective"; and

- The Agreement "appl[ied] to all small package transportation savings <u>effected by [Plaintiff]</u> regardless of Client's locations."

*See* discussions *supra* (emphases added).

---

(Doc. 67) at 2 n.2 (stating essentially same). Under the circumstances, the Court will presume the laws of the potentially relevant fora are materially similar, and it will apply the jurisprudence of Plaintiff's home forum. *See* Compl. at ¶ 1 (identifying Plaintiff as Pennsylvania corporation).

6

The correlation between Alpine's cost savings and the use of Plaintiff's recommendations is clearly drawn in the individual provisions and, particularly, when the provisions are read as a whole. Once Alpine obtained more favorable rates through the Flowers buyout -- an event wholly unrelated to Plaintiff's involvement -- the obligation to share cost savings in the form of fees ended. Likewise, any savings enjoyed by Kencraft and Maxfield through the UPS/Alpine Agreement were nullified when UPS unilaterally terminated that agreement and negotiated a new one with those entities based on their changed shipping needs. *See generally* discussions *supra*; *see also id.* at n.4 (highlighting lack of evidence refuting fact that UPS terminated 2005 Agreement, and Plaintiff's failure to state claims against UPS).

Although Plaintiff may find this result unfair, it had every prerogative to contractually address situations like the Flowers buyout but failed to do so. Given the language of the Agreement, it seems clear that Plaintiff was the drafter. *See generally* Agreement (referring to parties as "SmartTran" and "Client"). In any event, the Agreement was a commercial transaction between sophisticated business entities, and it does not reflect the type of arrangement warranting special protections or consideration under the law. *Cf. generally, e.g.*, Foster v. Chesapeake Ins. Co., Ltd., 933 F.2d 1207, 1219 (3d Cir. 1991) (contractual provisions were less susceptible to legal challenge where dispute surrounded "an arms'-length deal, between sophisticated commercial entities, unaffected by fraud, undue influence, or overweening bargaining power") (citation and internal quotations omitted).

Simply put, had Plaintiff wished to protect itself from the effects of Alpine's restructuring and/or sale of business interests, it should have included contract provisions addressing the same. As it stands, the Agreement is silent, and "[i]t is not the province of the court to alter [the] contract by construction or to make a new contract for the parties." *See* Seven Springs Farm,

Inc. v. Croker, 748 A.2d 740, 744 (Pa. Super. 2000) (citation omitted), *aff'd*, 801 A.2d 1212 (Pa. 2002); *see also id.* ("when a contract fails to provide for a specific contingency, it is silent, not ambiguous," and "we will not read into the contract a term, 'merger,' which clearly it does not contain"; "[the court's] duty is confined to the interpretation of the [agreement that the parties] have made for themselves, without regard to its wisdom or folly," and "[t]he most we can say is the parties either intended to exclude mergers, or did not anticipate or consider such an event") (citations omitted); Banks Eng'g Co., Inc. v. Polons, 697 A.2d 1020, 1023 (Pa. Super. 1997) (holding same because "[t]he courts are not generally available to rewrite agreements or make up special provisions for parties who fail to anticipate foreseeable problems") (citation to quoted source omitted).[6]

Plaintiff's references to the covenants of good faith and fair dealing do not undermine this result. "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned," and "bad faith" includes "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance." Kaplan v.

---

[6] At the very best, Plaintiff may have urged for an application of the "gap filling" provisions under the Restatement (Second) of Contracts. *See id.* at § 204 & cmt. b (court may supply terms that are "reasonable [under] the circumstances" where "[t]he parties to an agreement . . . entirely fail[ed] to foresee [a] situation which later arises and gives rise to a dispute"). Plaintiff's lack of argument in this regard is understandable, given that the Agreement's silence on the relevant issue(s) leaves "no gap for the court to step into." *See* Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc., 2008 WL 863608, *17 (W.D. Va. Mar. 31, 2008) (although law permits courts to insert omitted terms under certain circumstances, "it is not necessary to do so in [a case where] there is no omitted term that is essential to a determination of the parties' rights and duties"; Rest. (2d) of Contracts § 204 applies only where "the court [is] attempting to implement a provision in an agreement that the parties had already contemplated in part"); United Steelworkers of America, AFL-CIO-CLC v. North Bend Terminal Co., 752 F.2d 256, 261 (6th Cir. 1985) ("[t]he terms typically supplied by courts are a reasonable price . . . or a time requirement"; "[h]ere there is no such range of possible solutions, [so] we must inevitably choose one party's interpretation over the other").

Cablevision of PA, Inc., 671 A.2d 716, 721-22 (Pa. Super. 1996) (citations to quoted source omitted).

There is no evidence Alpine was "[dish]onest[] . . . in the conduct or transaction concerned," or that it its sweeping, lucrative reorganization and sale to Flowers was undertaken to evade the spirit of the bargain or to effectuate any other category of "bad faith" behavior. Nor is there any indication that Alpine knew of its future business opportunity with Flowers, and not even Plaintiff is willing to suggest the deal was made to avoid Alpine's duties under the Agreement. *See* Pl.'s Opp'n Br. at 1-2 (Plaintiff "has never made" "[the] straw man" argument that Alpine's restructuring and sale "was [undertaken] to evade Defendants' responsibilities [under the Agreement]"). If anything, Defendants' continued payment of Plaintiff's invoices until it became absolutely clear that Plaintiff's recommendations no longer were of utility arguably evidences good faith, not bad. *Cf.* Kaplan, 671 A.2d at 722 ("[Plaintiff]'s argument that the Cable Companies failed to act in good faith is premised on their alleged duty to provide continuous service or voluntarily [refund] fees paid in advance by the cable subscribers when an outage occurs. We previously concluded that the Cable Companies were not contractually bound to provide such service or credit," and their "providing credits when a subscriber notified them of a service interruption" despite absence of legal duty "evidences honesty and good faith conduct, not bad faith conduct . . . .").[7]

---

[7] Plaintiff's evidence that Defendants previously questioned the amounts in its invoices; raised some internal accounting concerns regarding payment of the same; and engaged in discussions regarding their potential legal rights and liabilities under the Agreement do not modify the Court's conclusions. *See* Pl.'s Opp'n Br. at 4-6. The fact remains that Defendants fulfilled their obligation to pay fees until those obligations ended. *See* discussion *supra*; *compare also* Pl.'s Opp'n Br. at 5 (arguing Defendants "were seeking a way out of the Agreement for some time") *with id.* at 2 (eschewing "straw man" argument that Flowers acquisition was undertaken to avoid duties under Agreement).

In addition, the implied duty of good faith and fair dealing "cannot trump the express provisions [of] the contract," and it is available only to effectuate "the reasonable expectations of the parties." *See* Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. 2005) (citation and internal quotations omitted, emphasis added). As seen above, the Agreement was completely silent regarding the eventualities that unfolded, and any expectation that Plaintiff enjoyed protection under the contract was patently unreasonable. *See id.*; *cf. also* Pl.'s Opp'n Br. at 2 ("[Plaintiff] does not dispute that . . . Defendants [had] a right to restructure, consolidate, merge and sell off entities and stock to other companies").

In light of the foregoing, and as a matter of law, no Defendant has breached the Agreement, and Plaintiff is not entitled to additional fees. Nothing in Plaintiff's opposition papers demonstrates the contrary.

Plaintiff first argues that the Flowers acquisition did not "release . . . Defendants of liability" under the Agreement. *See* Pl.'s Opp'n Br. at 7 (internal capitalization of text omitted). Relatedly, Plaintiff notes evidence that Flowers "specifically assumed" the Agreement as a "material contract" under the purchase agreement. *See id.* at 8-10. Plaintiff's arguments are misplaced given the Court's conclusion that the events surrounding Defendants' restructuring and sale extinguished any obligation to pay fees under the Agreement. *See* discussions *supra*. In other words, even accepting that Flowers "assumed" all of Fannie May/Alpine's potential liabilities under the Agreement, none of the Defendants were obligated to pay fees once Plaintiff's recommendations ceased to yield savings in their shipping costs. *See id.*

Plaintiff next turns to its unjust enrichment claim against Flowers, inexplicably shifting focus to the benefits the company enjoyed generally though its acquisition of Fannie May/ Alpine and London. *See id.* at 11 (citing Flowers CEO's statement that acquisition would

10

"enhance [the company's] candy category growth margins"). There is no evidence or suggestion that Flowers's enhanced candy growth margin is at all attributable to Plaintiff's shipping cost recommendations, and this argument is without merit.

Plaintiff then sets its sights on the Agreement itself, focusing in isolation upon the three-year term identified in the fee provision. *See id.* at 13. Plaintiff would have the Court impose three years of fees irrespective of whether any decrease in Defendants' shipping costs resulted from the use of its recommendations. *See id.*; *see also id.* at 14 (suggesting Plaintiff's reading "is hardly unusual," analogizing to "exclusivity clause[s]" in real estate broker agreements). This interpretation, however, is completely untethered to the other provisions of the Agreement, which time and again correlate fee payments with the savings enjoyed through use of Plaintiff's recommendations. The contract must be regarded as a whole, and Plaintiff's reading cannot be squared with the provisions of the Agreement and the Court's interpretations thereof. *See* discussions *supra*; *compare also* Pl.'s Opp'n Br. at 14 (likening Agreement to real estate contract containing exclusivity clause) *with* discussion *supra* (finding that Plaintiff could have better protected its interests through contractual provisions, but Agreement was silent regarding Alpine's restructuring, sale, or similar events).[8]

---

[8] Plaintiff's creative interpretation of the Agreement leaves it scrambling to find an intelligible damages theory. *See, e.g.*, Pl.'s Opp'n Br. at 6 n.4 (suggesting Plaintiff somehow is entitled to savings enjoyed by Defendant London "with . . . shippers" other than UPS); *id.* at 8-9 (arguing Flowers is liable for fees under Agreement because it assumed Alpine's liability as "a material contract," despite fact that no Defendant enjoyed savings after October 2006 based on Plaintiff's recommendations); *id.* at 11 (seeking to recover for unjust enrichment based on non-shipping-related benefits enjoyed by Flowers through acquisition of certain Defendants); *and id.* at 15 (positing Plaintiff should recover "one half of the savings received" by Defendants, regardless of how or why such unspecified "savings" came into being). Plaintiff's inability to formulate a cogent, rational damages theory serves only to underscore the fallacies of its arguments on liability.

11

The analyses above defeat, either expressly or by implication, all of Plaintiff's arguments in opposition to summary judgment regarding breach of contract. It is equally apparent that Plaintiff's unjust enrichment theory fails as a matter of law. Defendants are entitled to summary judgment, and their Motion should be granted.

**CONCLUSION**

For all of the reasons stated above, Plaintiff's Motion for Partial Summary Judgment (Doc. 56) should be denied, and Defendants' Motion for Summary Judgment (Doc. 73) granted.

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by November 3, 2008. Responses to objections are due by November 17, 2008.


October 15, 2008                                s/Cathy Bissoon
                                                Cathy Bissoon
                                                United States Magistrate Judge

cc (via email):

Anthony J. Basinski, Esq.
Eric P. Reif, Esq.
Mary C. McGinley, Esq.
Patricia L. Dodge, Esq.
D. Craig Parry, Esq.
Judith F. Olson, Esq.
Kevin P. Lucas, Esq.